IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

KAMALI RIVES,[1]

                    Defendant.

CRIMINAL CASE NO.

1:14-CR-00130-TWT-JFK-4

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Kamali Rives' motion [Doc. 53] to suppress evidence seized on November 7, 2013, from 1553 Virginia Avenue, Unit 103-A, College Park, Georgia, motion [Doc. 88] to suppress evidence seized on September 9, 2010, from Rooms 304 and 719, Inn City Suites, Hapeville, Georgia, motion [Doc. 89] to suppress statements made on September 14, 2010, made on March 2, 2013, and made on November 8, 2013, and perfected motion [Doc. 91] to suppress evidence seized on November 7, 2013.  An evidentiary hearing was held on the pending motions on May 15, 2015 [Doc. 181, cited to as (Tr. at )], and concluded on June 4, 2015 [Doc.

---

[1]Defendants Rashon Bohannon and Jimia Fannin have entered pleas of guilty [Docs. 111 and 166], and Defendant Ashley Posey will be entering a plea of guilty [Docket Entry dated September 8, 2015].

182, cited to as (Tr. 6/4/15 at )].  The parties have filed post-hearing briefs in support of and opposition to the pending motions to suppress.  [Docs. 185 and 188].

At the evidentiary hearing, counsel for Defendant advised, with respect to the motion to suppress statements, that Defendant was not challenging the statements made on September 14, 2010, or on March 2, 2013.  (Tr. at 10-11).  And the court finds that Defendant has abandoned his challenge to the statements he made on November 8, 2013.  Defendant did not present any argument in support of his motion [Doc. 89] to suppress his post-arrest statement on November 8, 2013, and that motion is abandoned.[2]  See United States v. Zekic, 2010 WL 4962985, at *1 (N.D. Ga. October 28, 2010) (citing Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.")), adopted by 2010 WL 4967825 (N.D. Ga. December 1, 2010).[3]

---

[2]And the court finds that Defendant Rives knowingly, voluntarily and intelligently waived his Miranda rights on November 8, 2013, and that his statement is admissible.  (Tr. at 95-100; Gov't Exhs. 1, 10).

[3]Accord United States v. Elder, 2010 WL 5656687, at *3 (N.D. Ga. December 16, 2010) (citing United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1327 n.3 (N.D. Ga. 2009) ("Defendant has not perfected the motion [to suppress], and it is

2

Also pending before the court are Defendant's motion [Doc. 87] for severance of Defendants, motion [Doc. 179] for severance of counts, and motion [Doc. 172] to dismiss or for election as to Count One of the indictment.  The Government opposes the motions to sever counts and to dismiss.  [Docs. 189 and 190].  As discussed at the evidentiary hearing, due to the fact that Defendants Rashon Bohannon, Jimia Fannin and Ashley Posey have either entered pleas of guilty or intend to enter a plea of guilty, the motion [Doc. 87] to sever Defendants is moot.

## Motions to Suppress Evidence

Defendant contends that the evidence seized by law enforcement from the hotel rooms at the Inn City Suites on September 9, 2010, and from Unit 109-A, 1553 Virginia Avenue, on November 7, 2013, should be suppressed.  [Doc. 185].  He contends that, although law enforcement officers possessed valid search warrants for all of the locations searched, the officers executing the warrants exceeded the scope of the search authorized by seizing numerous items not identified on the warrant.  [Id.].  The Government opposes the motions to suppress arguing that the seizures either fell

deemed abandoned and withdrawn.  United States v. Shorr, No. 1:07-cr-182, 2008 WL 655994, [at] *1 (N.D. Ga. Mar[ch] 10, 2008) (Thrash, J., adopting Vineyard, M.J.) (deeming preliminary motion to suppress abandoned because the defendant failed to perfect the motion).") (internal quotation marks omitted)), adopted by 2011 WL 294507 (N.D. Ga. January 27, 2011).

within the scope of the searches authorized by the warrants or that, the law enforcement officers being lawfully in the locations executing the warrants, the items seized fell with the plain view doctrine. [Doc. 188]. With respect to the search occurring at Unit 109-A, the Government also argues that Defendant did not have a legitimate expectation of privacy and cannot challenge the execution of the warrants at that location. [Id. at 13-17]. After consideration of the arguments of Defendant and the Government and the record, the court recommends that, based on the totality of the circumstances, Defendant's motions to suppress be denied.

## I.  Background Facts

### a.  Inn City Suites Search

On September 9, 2010,[4] officers with the Hapeville Police Department were dispatched to the Inn City Suites, Central Avenue, in Hapeville, Georgia, in response to a report of an armed robbery and shots fired in the hotel. (Tr. at 106). When Detective Barry Barnes arrived at the hotel, along with a number of other officers, he questioned hotel personnel and other individuals in the lobby. Along with Lt. Hies, he proceeded up the stairwell to the seventh floor where the shots fired were reported

---

[4]The Assistant U.S. Attorney misspoke in directing the witness' attention to November 9, 2010, instead of the correct date of September 9, 2010. (Tr. at 106).

4

by hotel security guards.  (Tr. at 106-07).  The security guards reported exchanging gunfire with a suspect, whom they thought had been wounded.  (Tr. at 107, 109).  Detective Barnes smelled the odor of gun powder and observed some blood droplets in the stairwell.  (Tr. at 108).

The officers understood that the occupants of Room 719, one of whom was Defendant Rives, who were in the process of relocating to Room 304, had reported being the victims of a robbery.  (Tr. at 108-09).  Using a master key provided by the desk clerk, the officers entered Room 719 to determine if the shooter, the victims or any injured persons were located inside.  (Tr. at 109-10).  No one was located in that room.  (Tr. at 110).  Because the individuals registered in Room 719 were also registered in Room 304, the officers then entered Room 304 to look for the shooter, the victims or any injured persons; no one was located in that room.  (Tr. at 110).  The entire hotel was searched for the suspect and victims; they were not located.  (Tr. at 110).

Rooms 304 and 719 were then sealed; the doors to the rooms closed with law enforcement officers guarding the doors until search warrants for the rooms could be obtained.  No one entered the rooms or conducted a search while waiting for the warrants. (Tr. at 110-11, 122-23).  The victims of the robbery had left the hotel and

were not returning telephone calls placed to them by law enforcement.  (Tr. at 122).

Search warrants were obtained to seek evidence pertaining to the armed robbery,

including trying to determine a motive for the robbery (Tr. at 110-11), for Room 719

(Tr. at 112, Gov't Exh. 12) and Room 304 (Tr. at 112, Gov't Exh. 13).

The application and affidavit for both search warrants are the same, and the

search warrants only differ in authorizing a search of either Room 719 or 304.  (Gov't

Exhs. 12 and 13).  The warrants authorize a search for evidence pertaining to armed

robbery, aggravated assault and possession of a firearm during the commission of a

felony, including, "hair, fibers, DNA evidence, ammunition, projectiles, shell casings,

weapons, items that would be considered contraband as described by O.C.G.A., and

lockable boxes, cases, or contraption used to conceal these items."  (Id., Search

Warrants).  The affidavits summarize the events on the seventh floor and include the

information that officers arriving on the scene were advised that shots had been fired

on the seventh floor, that the officers had observed blood on that floor, that a search

did not reveal the suspect and that it was determined that he had fled the scene.  (Id.,

Affidavits).  Also included is the information provided by the security guards who

responded to the alleged robbery in Room 719.  They advised that they encountered

an unidentified black male exiting Room 719, that the individual had a firearm and

6

fired shots at the guards who returned fire, and that the victim who was registered in Room 719 was moving to Room 304. (Id.). Finally, the affidavit included information about the registrants of the rooms, Defendants Rives and Bohannon, who had left the hotel without speaking to police and who were under investigation by Detective Cushing for identity theft and fraud and had prior arrests for offenses including forgery, fraud, identity theft and drugs. (Id.).

While the officers were waiting for the search warrants, Detective Stephen Cushing, Hapeville Police Department arrived at the hotel. (Tr. at 119, 122). When the search warrants arrived at the hotel, Detectives Barnes and Cushing entered Room 719 to conduct the search. According to Detective Barnes, when they entered the room, he observed a bunch of financial documents with different names and folders with different names on the folders, hundreds of debit and credit cards with different names and some blank cards, and lots of information from tax refund cards in different names. Based on his observations, he believed the items to be evidence of fraudulent criminal activity because the location was a residence not a business. (Tr. at 113-14, Gov't Exh. 15). Detective Barnes' testimony did not clarify where all of this evidence was located, but he stated that, when searching for evidence of robbery, shells and

7

casings are located in surprising places and that blood goes "crazy" places. (Tr. at 116-18).

Detective Cushing provided a more detailed description of the search of Room 719.  The room consisted of a kitchen/living room and a separate bedroom.  Upon entry, he could see that the occupants were moving due to the presence of a flat cart with a TV and other items on it.  (Tr. at 123).  He described the bedroom as being in disarray and having a "very unusual" and "huge amount of credit cards and identifications" on top of a table.  (Tr. at 124).  Explaining that the hotel was an extended stay location with a low price point, his attention was also drawn to the large amount of clothing and "high-end goods" from stores outside of the area which he believed could have been purchased with the proceeds of fraudulent activity.  (Tr. at 123-24, 130).  He also observed thirty to fifty folders sitting out, and he stated that, without opening the folders, he observed different names on them for individuals not registered to the room and that some of the credit cards had the same names.  Also, Bohannon, who was registered to the room, had a photograph on one of the driver's licenses which was not in her name.  (Tr. at 125-26).  He apparently also looked inside some folders that he found out in the open finding more credit cards and identifications.  (Tr. at 131).  Based on his training and experience working credit card

8

fraud and identity theft cases, he could "instantly tell" that the items were evidence of credit card fraud and identity theft. (Tr. at 120, 125-26).

Detective Cushing then executed the warrant for Room 304. (Tr. at 115). In that room, he observed large TVs, electronics and a copy machine. (Tr. at 127). He also found a large pink file cabinet which he opened. The file cabinet could have held a firearm. Inside he found hundreds of folders with different names on them which he could see without opening the folders. (Tr. at 128-29). Inside the folders, he observed driver's licenses in different names and photographs and credit cards. (Tr. at 128). Out in the open, he also observed a printer and scanner which can be used in the commission of credit card fraud and identity theft. (Tr. at 129). Cash was found in an envelope located in a black bag. (Tr. at 129-30). In an open document safe, which could have held a firearm or ammunition, he also located additional items. And bank statements were scattered around the room. (Tr. at 131-32). He seized the items which, based on his training and experience, were consistent with credit card fraud and identity theft. (Tr. at 128, 130).

On cross-examination, although not clear as to which room the questions were directed or the answers provided, Detective Cushing confirmed that he could see the different names on the folders before opening them, that some of the folders were lying

9

around and some were in the file cabinet in Room 304, that a large amount of credit card documents and bank statements were lying on a table, and that, prior to seizing the folders, he did match some of the names on the folders to the credit cards he had seen. (Tr. at 137-39). Although some of the identification documents were lying in the open, most of the driver's licenses were in the folders. (Tr. at 139). He stated that due to the quantity of items he observed, he believed that a crime was being committed. (Tr. at 138-39).

**b.     1553 Virginia Avenue, Unit 103-A Search**

On November 7, 2013, at approximately 2:30 a.m., the College Park Police Department ("CPPD") received a call indicating that an individual had been attacked and robbed and that the victim was at a Waffle House located near the site of the incident. (Tr. at 16, 31). Officers Robin Davis and Jose Baez, CPPD, met with the victim, Darrell Pulliam[5] at the Waffle House, and he explained that a few days ago he was picked up and offered a construction/remodeling job by a male and female driving a Home Depot rental truck. (Tr. at 15-17, 49-50). They placed him overnight in a hotel room and then transported him to an office at 1553 Virginia Avenue where he

---

[5]In the warrants for the location, the victim's first name is spelled Daryle. (Gov't Exhs. 3 and 4).

10

was held against his will, his belongings were taken, and he was assaulted.  (Tr. at 16-19, 53).  Pulliam stated that he sat in the office all day as people came and left, that his identification was taken and copies were made of it, and that he observed a machine that "looked as if" it was being used to make credit cards.  (Tr. at 17-18).  When he refused to use one of the credit cards, he was beaten up.  (Tr. at 53).  Pulliam advised that his camouflaged duffle bag was taken from him and eventually placed in a black BMW sitting outside of the office and that he just wanted the bag back.  (Tr. at 18-19, 51-52).  An officer was sent to the location, and he observed the duffle bag located inside a black BMW.  (Tr. at 51-52).

Officer Davis then escorted Pulliam to 1553 Virginia Avenue where he pointed out Unit 103-A as the office in which he had been held.  (Tr. at 18-19, 35-37, 53).  The BMW was parked near that unit.  (Tr. at 51-52).  Officer Davis then left with Pulliam.  (Tr. at 20, 37-38).  Officer Baez, accompanied by a couple of other CPPD officers, approached the door to Unit 103-A, and as he did so, he could smell the strong odor of marijuana coming from inside the office.[6]  Lights were on inside and outside of the unit.  (Tr. at 21, 34, 37-38, 54, 60).  Officer Baez knocked and announced "College

---

[6]The officer testified that, based on his training and experience, he was able to detect the odor of marijuana.  (Tr. at 55).

11

Park Police."  He saw a female look out of the blinds, so he knocked and announced police again.  (Tr. at 54, 60).  The female opened the door, and the officer noted that the marijuana odor was stronger and that there was a "bunch of smoke inside" the office.  (Tr. at 54, 61).  The officer stepped inside the threshold and observed a front room and two other rooms, one to left and one to the back where he observed three males.  (Tr. at 54, 64).

Officer Baez directed everyone inside the unit to come out to the front room where each person was handcuffed and detained due to the officer's belief that there was a large amount of marijuana located in the unit.  (Tr. at 54, 60, 65).  A couple of other officers entered the front room to assist in detaining the four to five individuals present, and the other rooms, including a bathroom, were quickly checked to be sure no one else was present.  No search of the unit was conducted at that time.  (Tr. at 56, 62-64).  Defendant Rives, one of the individuals detained, questioned why the officers were there, and Officer Baez explained that a person had claimed to have been beaten in the office and due to the odor of marijuana.  (Tr. at 55).  Once the individuals found in the unit were detained, the officers left the unit with Officer Baez standing in the

12

open doorway to the unit.[7]  He instructed that no search of the unit take place until another officer returned with a search warrant for the unit.  (Tr. at 21-23, 38-39, 56-57).  Officer Hines was briefed on the situation, and he left to secure a search warrant. (Tr. at 24, 59).  Before Officer Hines returned, Detective Tyrone Washington,[8] CPPD, arrived at the unit and was briefed on the information provided by Pulliam and that individuals were being detained inside the unit.  No one was searching the unit.  (Tr. at 66-71).

At 5:15 a.m., on November 7, 2013, a municipal court judge signed a search warrant for 1553 Virginia Avenue, Unit 103-A, College Park, Georgia, to search for narcotics and paraphernalia associated with the sale, manufacture and distribution of illegal narcotics, documents, including address books, ledgers and other papers associated with the sale, manufacture and distribution of narcotics, proceeds, electronic devices used in association with the sale, manufacture and distribution of narcotics,

---

[7]When she returned, Officer Davis walked up to the open door and observed four or five individuals detained in a front room that appeared to be a lobby with a large screen TV.  (Tr. at 22, 38).  Neither she nor anyone else conducted a search of the office at this time.  (Tr. at 23).

[8]The detective had received training and had experience in conducting fraud investigations and was familiar with the type of evidence seized in these cases.  (Tr. at 66).

weapons, and "any other item consistent with trace evidence at the residence, stolen items which belong to the victim (Mr. Daryle Todd Pulliam) and others not on scene, and a mechanical device used to create fraudulent credit cards" all associated with violations of the controlled substance act, robbery, theft by receiving stolen property and financial transaction card fraud. (Tr. at 70, Gov't Exh. 3). In the affidavit for the search warrant, Officer Hines, after setting forth in detail his training and experience, described the events as related by Pulliam to the CPPD officers earlier that morning, including the making of copies of identification, credit and debit cards belonging to him and other unknown individuals, the refusal to allow Pulliam to leave, the theft of his duffle bag and the assault on his person. (Tr. at 70, Gov't Exh. 5). Officer Hines also included the officers' observations at the unit, including, finding Pulliam's belongings in the BMW and the detection of a strong odor of marijuana in the unit. (Id.).

When Officer Hines arrived back with the search warrant, Officer Davis retrieved Pulliam's duffle bag from the BMW and released it to him. (Tr. at 24-25, 44). She, Detective Washington and other officers then entered Unit 103-A to conduct the search. In the back room, the officers found a desk, with a computer on top, and a filing cabinet. (Tr. at 25, 40, 48). They observed several different credit cards with

14

different names and identifications from different states; the cards had photographs of different people; and there were some blank cards. They also found lists of names with vital information used for identity theft. Machines used to make credit cards, an embosser and credit card reader, were located in a filing cabinet along with cases of cards and other paperwork. Some of the credit cards, identifications and other information were found out in the open, some in the desk drawers, some in the cabinet and some inside file folders. (Tr. at 25-28, 31, 41-43, 45-47, 71-78, 82-83; Gov't Exhs. 2, 6). Detective Washington stated that, based on his training and experience, the items seized, including the machines, were consistent with the commission of the crimes of identity theft and credit card fraud. (Tr. at 71-72, 74-78). The officers also found a large amount of marijuana and some currency in a bag which, in Detective Washington's opinion, was not normal. (Tr. at 76-77). Officer Davis testified that the drawers, cabinet and file folders that she examined could have held drugs, drug ledgers and logs and that the file cabinet did hold the card making machine. (Tr. at 26-27, 31). Also, although not specifically trained in fraud cases, she stated that based on the information provided by Pulliam about the copying of identifications and the credit card making machine and her observations of all of the items found in the back office,

15

she believed that the items constituted evidence of fraudulent criminal conduct.  (Tr. at 28, 30, 42-43).

After completing the search, CPPD Officer Denard contacted Ashford Scott, a Special Agent with the Secret Service,[9] and described the evidence seized.  (Tr. at 84, 86-87).  After he examined the items seized, Agent Scott confirmed that the evidence was consistent with credit card fraud and identity theft.  (Tr. at 87-88).  He was advised by the searching officers that a computer and shredder, both of which he stated could contain evidence relevant to these crimes, were left in the unit.  (Tr. at 78-79, 88-89).  Accordingly, the officers requested and obtained a second search warrant, based on the same affidavit and authorizing a search for the same list of items, at 3:39 p.m. on November 7, 2013.  (Tr. at 78, Gov't Exh. 4).  Detective Washington returned to the unit with Agent Scott.  (Tr. at 79).

In the back room of the unit, Agent Scott observed an Epson printer with a counterfeit American Express card template in plain view and a shredder in which strips of American Express cards could be observed.  He also observed dates of birth and Social Security numbers on pieces of paper.  (Tr. at 91-92; Gov't Exh. 7).  When

---

[9]Defendant stipulated that Agent Scott was trained and experienced with respect to detecting evidence related to credit card fraud and identity theft.  (Tr. at 85-86).

16

he looked at the monitor for the desktop computer, the screen was displaying a Russian website store that, based on his experience, the agent knew sold information in bulk for use in fraudulent activity.[10]  (Tr. at 92, Gov't Exh. 7).  The agent also located a Glock firearm underneath the desk, hot tin foil used to make credit cards and a garbage bag full of Green Dot loadable cards which are used to download information from skimmed credit cards.  (Tr. at 93, 103-04, Gov't Exh. 7).

That evening Agent Scott spoke to most of the individuals detained that day in the unit but, due to the lateness of the hour, did not speak to Defendant Rives.  (Tr. at 96-96).  The next day, Defendant Rives asked to speak with the agent, who recorded the conversation.  (Tr. at 96-97, Gov't Exhs. 1 and 10).  During the conversation, Defendant verbally consented to a search of the computer seized from the unit, and after the recorded interview was completed, he executed a written consent form.  (Tr. at 98-99, Gov't Exh. 11).  The agent read the form to Defendant, who appeared to understand the information on the form.  (Tr. at 99).  The agent was not armed, and he

---

[10]Another photograph of the computer monitor depicted the screen as black, and when asked to explain, Agent Scott responded, "Sleep, I guess, not being used timed out."  He could not explain how the screen "woke up" but opined that someone may have bumped the desk, causing the wireless mouse to move and activate the monitor.  (Tr. at 101-03).

17

did not threaten Defendant, made no promises to Defendant, and spoke in a conversational tone of voice.  (Tr. at 99-100).

At the evidentiary hearing, Defendant Rives testified as follows:

Q:      Let me draw your attention to November 7th, 2013, the day of the search.  Did you have a key to the front door of Unit 103-A at 1553 Virginia Avenue, College Park, Georgia?

A:      Yes, I do.

Q:      Did you have the ability to let people in the unit and also have the ability to deny others access to the unit?

A:      Yes, I did.

Q:      Did you keep any personal papers at Unit 103-A?

A:      Yes, I did.

(Tr. 6/4/15 at 3-4).

Additional information will be set forth as necessary during discussion of the pending motions to suppress.

**II.    Discussion**

Defendant Rives contends that the items seized during the execution of the search warrants for Rooms 304 and 719 at Inn City Suites in September 2010 and for Unit 103-A at 1553 Virginia Avenue, College Park, in November 2013 exceeded the

18

scope of the search for the items for which the searches were authorized.  [Doc. 185].

In making this argument, Defendant states that the search warrants provided a

particularized list of items that could be seized but that the searches violated his Fourth

Amendment rights because the scope of those warrants were exceeded becoming

general searches.  [Id.].  The Government, however, contends that the items seized in

each search, if not specified on the warrants, were lawfully seized pursuant to the plain

view doctrine.  [Doc. 186].  Also, with respect to the searches conducted at Unit 103-

A, the Government contends that Defendant lacked a reasonable expectation of privacy

in the location and cannot challenge the searches.  [Id.].

"In order to have evidence suppressed based on a violation of the Fourth

Amendment, a [defendant] has the burden of proving (1) that the search was unlawful

and (2) that the [defendant] had a legitimate expectation of privacy."  United States v.

McKennon, 814 F.2d 1539, 1542 (11th Cir. 1987).  And specifically with respect to

attacks on searches conducted pursuant to a warrant, "[t]he warrant stands cloaked with

a presumption of validity . . . and [a defendant] ha[s] the burden of proof in challenging

the validity of its execution or service."  United States v. Vigo, 413 F.2d 691, 693 (5th

Cir. 1969)[11]; accord United States v. Marx, 635 F.2d 436, 441 (5th Cir. Unit B 1981) (same). "The Fourth Amendment provides, in relevant part, 'no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" United States v. Evans, 469 F. Supp. 2d 893, 896 (D. Mt. 2007) (quoting U.S. Const. amend. IV); United States v. Wuagneux, 683 F.2d 1343, 1348 (11th Cir. 1982) ("The Fourth Amendment requires that warrants 'particularly describ[e] the place to be searched, and the persons or things to be seized.'") (quoting U.S. Const. amend. IV).

> The Eleventh Circuit Court of Appeals has stated that:
>
> If a search exceeds the scope of terms of a warrant, any subsequent seizure is unconstitutional. However, a search may be extensive as reasonably necessary as required to locate the items described in the warrant, and is generally "not limited by the possibility that separate acts of entry or opening may be required to complete the search."

United States v. Jackson, 120 F.3d 1226, 1228 (11th Cir. 1997) (quoting United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992)). "The crucial inquiry is always 'whether the search and seizures were reasonable under all the circumstances.'" United States v. Schandl, 947 F.2d 462, 465 (11th Cir. 1991) (quoting Wuagneux, 683

---

[11]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

F.2d at 1352). This includes consideration of whether the agents executing the warrant reasonably interpreted the list of property to be seized to include items that may not be specifically listed in the warrant. See United States v. Hill, 19 F.3d 984, 987 (5th Cir. 1994) ("In identifying the property to be seized, the agents are 'required to interpret the warrant,' but are 'not obliged to interpret it narrowly.'") (citation omitted).

Seizure of items beyond the scope of the warrant does not automatically invalidate the search. In United States v. Khanani, 502 F.3d 1282 (11th Cir. 2007), the Eleventh Circuit Court of Appeals summarized the Court's prior holdings:

> Total suppression of all items seized, including items within a warrant's scope, is not appropriate unless the executing officers' conduct "exceeded any reasonable interpretation of the warrant's provisions." . . . "[A]bsent a 'flagrant disregard' of the terms of a warrant, the seizure of items outside the scope of the warrant will not affect admissibility of items properly seized," . . . or "constitute reversible error on direct appeal from the conviction."

Id. at 1289 (quoting Wuagneux, 683 F.2d at 1354; United States v. Lambert, 887 F.2d 1568, 1572 (11th Cir. 1989)); see also Schandl, 947 F.2d at 465. And if an exception to the warrant requirement is established, items exceeding the scope of a lawful warrant may be seized. One such exception is the plain view doctrine. See Horton v. California, 110 S. Ct. 2301, 2306 (1990); United States v. Hamie, 165 F.3d 80, 83 (1st Cir. 1999) ("As the Supreme Court has stated, [a]n example of the applicability of the

21

plain view doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character.") (quoting Coolidge v. New Hampshire, 91 S. Ct. 2022, 2037-38 (1971)) (internal quotation marks omitted).

"An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent." United States v. Hromada, 49 F.3d 685, 690 n.11 (11th Cir. 1995) (citing Horton, 110 S. Ct. at 2308); and see United States v. Folk, 754 F.3d 905, 911 (11th Cir. 2014) (same); United States v. Susini, 261 Fed. Appx. 270, 273 (11th Cir. 2008) ("[I]t is well-settled that 'objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence.'") (quoting Harris v. United States, 88 S. Ct. 992, 993 (1968)); United States v. Simpson, 259 Fed. Appx. 164, 165-68 (11th Cir. 2007) (upholding plain view seizure of a backpack containing marijuana when officers were inside the residence conducting consent search to look specifically for weapons and injured persons).

22

"The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband."  United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1995) (citing Arizona v. Hicks, 107 S. Ct. 1149, 1153 (1987)); and see Susini, 261 Fed. Appx. at 273 (same).  "Probable cause does not require certainty. . . .  In reviewing probable cause determinations, [a court] must consider the totality of the circumstances-including the officers' training and experience as well as their knowledge of the situation at hand." Buchanan, 70 F.3d at 826; see also Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) ("Because 'sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment,' . . . 'probable cause itself is a doctrine of reasonable probability and not certainty[.]'") (citation omitted).  "[A] police officer may draw inferences based on his own training and experience in deciding whether probable cause exists . . . ."  United States v. Reeves, 604 Fed. Appx. 823, 827 (11th Cir. 2015); and see United States v. Edwards, 2010 WL 5184784, at *9 (N.D. Ga. October 13, 2010) (in finding that documents containing names and telephone numbers were properly seized pursuant to the plain view doctrine, the court noted that "[i]n considering whether probable cause exists, the observations and experiences of the law enforcement officers working a case must be weighed as a part of the totality of the

23

circumstances that might create probable cause"), <u>adopted by</u> <u>United States v. Jones</u>, 2010 WL 5276983 (N.D. Ga. December 15, 2010).

And in conducting a search pursuant to a warrant, as noted, searching officers "ha[ve] the right to conduct a search as 'extensive as reasonably required to locate the items described in the warrant[,]'" <u>Folk</u>, 754 F.3d at 911 (quoting <u>Jackson</u>, 120 F.3d at 1228), and are "permitted 'to break open locked containers which may contain the objects of the search[,]'" <u>Id.</u> (quoting <u>Martinez</u>, 949 F.2d at 1120). <u>And see</u> <u>United States v. Ross</u>, 102 S. Ct. 2157, 2170-71 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.").

The court will apply these legal guidelines to resolve the pending motions to suppress.

### a.    Searches at Inn City Suites

The Government does not challenge Defendant's legitimate expectation privacy in the two rooms, 304 and 719, searched on September 9, 2010, due to the fact that he was a registered occupant of both rooms.   (Tr. at 108-09).   However, after consideration of the totality of the circumstances surrounding the execution of the

24

search warrants for Rooms 304 and 719 and the arguments of Defendant and the Government, the court finds that the plain view doctrine authorized seizure of the items not listed in either warrant and recommends that the motions to suppress addressing these searches be denied.

The search warrants for Rooms 304 and 719 of the Inn City Suites were issued as the result of the armed robbery reported by the individuals registered to those rooms and because of the shooting incident on the seventh floor of the hotel after the robbery was reported. (Tr. at 106-09, 116). The warrants authorized the search for evidence pertaining to armed robbery, aggravated assault and possession of a firearm during the commission of a felony, including, "hair, fibers, DNA evidence, ammunition, projectiles, shell casings, weapons, items that would be considered contraband as described by O.C.G.A., and lockable boxes, cases, or contraption used to conceal these items." (Gov't Exhs. 12, 13, Search Warrants). The affidavits for the search warrants summarized the events on the seventh floor and included information that officers arriving on the scene were advised that shots had been fired on the seventh floor, that the officers had observed blood on that floor, that a search did not reveal the suspect and that it was determined that he had fled the scene. (Id., Affidavits). Also included is information provided by the security guards who responded to the alleged robbery

25

in Room 719.  They advised that they encountered an unidentified black male exiting Room 719, that the individual had a firearm and fired shots at the guards who returned fire, and that the victim who was registered in Room 719 was moving to Room 304. (<u>Id.</u>).  Finally, the affidavit included information about the registrants of the rooms, Defendants Rives and Bohannon, who had left the hotel without speaking to police, who were under investigation by Detective Cushing for identity theft and fraud and who had prior arrests for offenses including forgery, fraud, identity theft and drugs. (<u>Id.</u>).

The officers entered Room 719 and Room 304 based on the warrants and, accordingly, were lawfully in both rooms to execute the warrants satisfying the first prong of the plain view doctrine.  The warrants authorized the seizure of various items, such as, firearms, shell casings, hair, fibers, etc., which could have been secreted in drawers, closets and other small containers allowing the searching officers to look into such areas for the items listed on the warrants and, if discovered, allowing the officers to seize any other items constituting contraband or evidence of criminal activity from out in the open in the rooms or from smaller containers and compartments in the rooms.  (Tr. at 117, 128, 130-31).  Based on the information provided by the officers,

26

the second prong of the plain view doctrine is satisfied, that is, that the items seized were probably contraband or evidence of criminal conduct.

Detective Cushing, who has training and experience with financial fraud cases and who was investigating the occupants of Rooms 304 and 719 for fraudulent activities, and Officer Barnes, who has been a law enforcement officer for nineteen years, first entered Room 719 and observed items in the process of being moved from that room and a bedroom in disarray. (Tr. at 105, 112, 119-20, 123-24; Affidavit for Search Warrants). Out in the open, they observed a "huge amount of credit cards and identifications" and a large amount of "high-end goods" - clothing and electronics - from stores located outside of the area in which the hotel was located. (Tr. at 113-14, 124-26). The credit cards were in different names and a number of the cards were blank. (Tr. at 113, 124-25). Officer Barnes and Detective Cushing also observed scattered around the bedroom a lot of folders with different names on the folders; the detective observed the names without opening the folders and that some of the credit cards were linked to the names. (Tr. at 113, 125-26, 139). He also saw a drivers license with the photograph of one of the room's registrants, Bohannon, but he observed that the license was not in her name. (Tr. at 125). According to Detective Cushing, based on his training and experience, he could "instantly tell" that the items

27

he observed were evidence of identify theft and credit card fraud. (Tr. at 125, 138-39). Officer Barnes likewise believed that the items were linked to fraud. (Tr. at 114). At this point, based on their observations, the officers executing the warrant were authorized to seize all of these items based on the plain view doctrine. See Reeves, 604 Fed. Appx. at 827-28; United States v. Dabrezil, 603 Fed. Appx. 756, 759-60 (11th Cir. 2015); Susini, 261 Fed. Appx. at 274.

Detective Cushing then searched Room 304. In that room, he also observed large TVs and other electronics, such as a copy machine, a printer and a scanner, which the detective advised could be used to commit identity theft and credit card fraud. (Tr. at 127, 129). He observed scattered about the room more file folders with names on the outside and other banking statements, credit cards and identifications in different names. (Tr. at 131-32, 138-39). The detective also opened a pink file cabinet, which could have held a firearm, and inside observed a couple hundred file folders, again with different names on the outside. (Tr. at 127-28). Inside a small bag, the detective found a quantity of currency and in an open, small document safe, which could have held a firearm or ammunition, he found more documents. (Tr. at 129-31). As in Room 719, Detective Cushing, based on his training and experience, determined that the items were consistent with identity theft and credit card fraud. (Tr. at 128-32, 138-39).

28

At this point, as stated *supra*, based on his observations, he was authorized to seize all of these items based on the plain view doctrine.

Defendant challenges the officers' action of looking inside the folders found in both hotel rooms; however, the incriminating character of the folders, especially in light of all the other evidence in plain view, was apparent before the folders were opened and justified seizure of the folders. (Tr. at 113, 124-25, 128-29, 139). And "[w]here an object may lawfully be seized under the plain-view doctrine, it also may validly be searched." Reeves, 604 Fed. Appx. at 826, 828 (allowing officer to "manipulate" a back pack during a search for narcotics and then to more closely scrutinize items, a notebook and computer, found in the backpack which were validly seized pursuant to the plain-view doctrine); and see Dabrezil, 603 Fed. Appx. at 760 (during a protective sweep, lying on a bed, an officer found a notebook with a ledger on top containing "names, dates of birth, and social security numbers[;]" the court stated that "[b]ased on the information in the ledger found on top of the notebook and the ledger's close proximity to the notebook itself, officers had probable cause to believe that the ledger was contraband and that the contents of the notebook beneath it contained similar incriminating information"). Detective Cushing, having lawful possession of the folders, was authorized to quickly examine the contents in which he

29

found additional forms of identification, photographs and credit cards all of which he determined was evidence of identity theft and credit card fraud.  (Tr. at 128-29, 131-32, 138).

The court finds that the items seized from Rooms 304 and 719 which were not listed on the warrants for those rooms were validly seized pursuant to the plain view doctrine.

### b.   Searches of Unit 103-A

#### 1.   Expectation of Privacy

As noted, the Government contends that Defendant cannot challenge the searches in Unit 103-A, 1553 Virginia Avenue, College Park, because he lacked a reasonable expectation of privacy in the location at the time of the search in November 2013.  [Doc. 188 at 13-17].  To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is Defendant Rives' burden to prove that he has a legitimate expectation of privacy in the object of the search, Unit 103-A, on November 7, 2013.  See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the

30

individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate." <u>Hastamorir</u>, 881 F.2d at 1559 (citation omitted).  In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'" <u>United States v. Brown</u>, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting <u>Rakas v. Illinois</u>, 99 S. Ct. 421, 425 (1978)).  Thus, "'in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" <u>United States v. Chaves</u>, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted).  In other words, "Fourth Amendment rights are personal and may not be vicariously asserted." <u>Lenz v. Winburn</u>, 51 F.3d 1540, 1549 (11th Cir. 1995).

"A defendant may have a legitimate expectation of privacy in a premises he did not own or rent if he demonstrates 'an unrestricted right of occupancy or custody and control of the premises distinguished from occasional presence on the premises as a mere guest or invitee." <u>United States v. Burke</u>, 521 Fed. Appx. 720, 723 (11th Cir.

31

2013) (citation omitted); and see United States v. Sarda-Villa, 760 F.2d 1232, 1236 (11th Cir. 1985) (same).  Apparently, Defendant did not own or lease the location of the search in this case as he offered no evidence to that effect.  And the space searched appeared to be an office not a residence.[12]  For that reason, Defendant's claim of an expectation of privacy in Unit 103-A requires an "case-by-case" analysis with the following considerations guiding the court's analysis:

> "Generally, courts tend to find [a legitimate expectation of privacy] when the area searched is set aside for the defendant's exclusive use, such as an individual office.  However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched.  The greater the degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found.  By contrast, the less private a work area-and the less control a defendant has over that work area-the less likely standing is to be found."

United States v. Lisbon, 835 F. Supp. 2d 1329, 1343 (N.D. Ga. 2011) (citation omitted).  Applying this guidance to the facts before the court, Defendant did not establish a legitimate expectation of privacy in Unit 103-A at the time of the search.

In support of his claim, Defendant testified as follows:

Q:      Let me draw your attention to November 7th, 2013, the day of the search.  Did you have a key to the front door of Unit 103-A at 1553 Virginia Avenue, College Park, Georgia?

---

[12]The search warrants for the location identify the space as "Professional Business Solutions Unit 103-A."  (Gov't Exhs. 3 and 4).

AO 72A
(Rev.8/82)

A:      Yes, I do.

Q:      Did you have the ability to let people in the unit and also have the ability to deny others access to the unit?

A:      Yes, I did.

Q:      Did you keep any personal papers at Unit 103-A?

A:      Yes, I did.

(Tr. 6/4/15 at 3-4).  The fact that Defendant possessed a key, but not the only key, to the unit did not establish an legitimate expectation of privacy.  See Burke, 521 Fed. Appx. at 724 (finding that possession of a key and sometimes spending the night with the owner of the premises did not establish a legitimate expectation of privacy); United States v. Crisp, 542 F. Supp. 2d 1267, 1274 (M.D. Fla. 2008) ("the mere possession of a key to the premises is not sufficient to establish a legitimate expectation of privacy") (citing Chaves, 169 F.3d at 691; United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984)).  Although Defendant claimed to have the ability to allow and to deny access to the unit, he did not claim to have the exclusive right to do so, and the evidence at the hearing refutes any such inference.

33

When the officers knocked on the door to Unit 103-A, a female, after initially peering through the blinds, then opened the door to the unit and allowed the officers to have access.  (Tr. at 53-55).  There is no evidence that Defendant, who was present in the back office, made the determination to open the door.  The record is also silent as to how often and for how long Defendant was present in the unit except for the period leading up to the search.  And the evidence before the court undermines any argument that Defendant had exclusive control over any part of the unit, as a number of individuals were present in the back office when the officers arrived before the search occurred (Tr. at 54-55, 62-64), or that he took precautions to maintain his privacy, as evidenced by the fact that he and others present engaged in criminal activity in full view of the victim, Mr. Pulliam (Tr. at 16-19, 50-51, 53).

The fact that papers belonging to Defendant were in the unit also does not establish a legitimate expectation of privacy, especially in light of the reasonable inference that the paperwork was part of the ongoing criminal activity at the location. In United States v. Henry, 939 F. Supp. 2d 1279 (N.D. Ga. 2013), the court discussed and rejected a defendant's claim of a reasonable expectation of privacy in a residence leased to his girlfriend on a record establishing much closer ties to the location than Defendant Rives established in this case.  In Henry, evidence linked the defendant to

34

the residence, including: clothing believed to belong to the defendant; a vehicle associated with the defendant was parked in the garage of the residence; a neighbor had seen the defendant spending the night a couple of times; and, a day prior to the search, the defendant was believed to have conducted a drug deal in the residence, in which attempts were made to secrete controlled substances. Id. at 1287-88. The court found that "[n]one of these facts, singularly or in combination, shows an unrestricted right of occupancy or custody and control of the premises . . ." and that the defendant's "drug dealing on the premises (and hiding the drugs in the walls and elsewhere) does not serve to establish a legitimate expectation of privacy in the premises." Id. at 1288 (citations and internal quotation marks omitted); and see Sarda-Villa, 760 F.2d at 1236-37 (the defendants attempted to establish a legitimate expectation of privacy, in part, based on efforts to secrete drugs on the boat; the court rejected that argument stating that "we are not willing to say that society is prepared to recognize a justifiable expectation of privacy solely on the basis of [the defendants'] efforts to secret the contraband"). Likewise, in this case, Unit 103-A appeared to have been utilized solely for the purpose of conducting criminal activities involving identity theft and credit card fraud, and to the extent Defendant sought to protect such activity or items found associated with his alleged criminal conduct, his expectation of privacy was not

35

objectively reasonable.  See United States v. Huerta, 2009 WL 5065694, at **1-2 (E.D. Tenn. December 16, 2009) (finding that the defendant's use of the trailer as a storage bin for his marijuana "did not give him a reasonable expectation of privacy," the court noted that "[s]ociety is not prepared to accept as legitimate an expectation of privacy that is based solely upon the storage of illegal contraband," given a lack of ownership interest in the property).

For these reasons, the court finds that Defendant lacked a reasonable expectation of privacy in Unit 103-A and cannot challenge execution of the search warrants for that location.  However, even if Defendant had made this showing, the court nonetheless finds that the motions to suppress should be denied on the same grounds as set forth *supra*, that is, the plain view doctrine.

## 2.    Execution of Search Warrants

The first search warrant for Unit 103-A was issued after the victim, Mr. Pulliam, reported to law enforcement that he was detained against his will in that location and robbed of his duffle bag, beaten when he refused to use apparently fraudulent credit cards, and observed the occupants making fraudulent identifications and credit cards. (Tr. at 16-19, 50-51, 53).  When officers responded to that location, the strong odor of marijuana was detected which led officers to believe a large amount of drugs was

36

inside the unit.  (Tr. at 54, 59, 65).  After the occupants, including Defendant, and the unit were secured, a search warrant was obtained.  (Tr. at 54-58, 62-64).

A municipal court judge signed a search warrant for 1553 Virginia Avenue, Unit 103-A, College Park, Georgia, to search for narcotics and paraphernalia associated with the sale, manufacture and distribution of illegal narcotics, documents, including address books, ledgers and other papers associated with the sale, manufacture and distribution of narcotics, proceeds, electronic devices used in association with the sale, manufacture and distribution of narcotics, weapons, and "any other item consistent with trace evidence at the residence, stolen items which belong to the victim (Mr. Daryle Todd Pulliam) and others not on scene, and a mechanical device used to create fraudulent credit cards" all associated with violations of the controlled substance act, robbery, theft by receiving stolen property and financial transaction card fraud.  (Tr. at 70, Gov't Exh. 3).  In the affidavit for the search warrant, the affiant, Officer Hines, after setting forth in detail his training and experience, described the events as related by Pulliam to the CPPD officers earlier that morning, including the making of copies of identification, credit and debit cards belonging to him and other unknown individuals, the refusal to allow Pulliam to leave, the theft of his duffle bag and the assault on his person.  (Tr. at 70, Gov't Exh. 5).  Officer Hines also included the

37

officers' observations at the unit, including, finding Pulliam's belongings in the BMW and the detection of a strong odor of marijuana in the unit.  (Id.).  Because the warrant authorized the search for documents, including address books, ledgers and other papers associated with drug dealing, as well as for drugs, the searching officers were authorized to search within containers which might hold such evidence, which would include folders and files found inside desk and cabinet drawers.  See Ross, 102 S. Ct. at 2170-71;  Folk, 754 F.3d at 911; Jackson, 120 F.3d at 1228.  And while doing so, pursuant to the plain view doctrine, the officers were authorized to seize evidence of criminal conduct even if not identified in the warrant.  See Horton, 110 S. Ct. at 2306; Susini, 261 Fed. Appx. at 273; Buchanan, 70 F.3d at 826.

Present to conduct the search was College Park Officer Davis and Detective Washington, the latter being trained in the detection of fraudulent criminal conduct including identity theft and credit card fraud and having experience working investigations involving these crimes.  (Tr. at 15-16, 25, 66-67).  In the back office of the unit, the searching officers observed several different credit cards with different names and identifications from different states; the cards had photographs of different people; and there were some blank cards.  They also found lists of names with vital information used for identity theft.  Machines used to make credit cards, an embosser

38

and credit card reader, were located in a filing cabinet along with cases of cards and other paperwork.  Some of the credit cards, identifications and other information were found out in the open, some in the desk drawers, some in the cabinet and some inside file folders.  (Tr. at 25-28, 31, 41-43, 45-47, 71-78, 82-83; Gov't Exhs. 2, 6). Detective Washington stated that, based on his training and experience, the items seized, including the machines, were consistent with the commission of the crimes of identity theft and credit card fraud.  (Tr. at 71-72, 74-78).  The officers also found a large amount of marijuana and some currency in a bag which, in Detective Washington's opinion, was not normal. (Tr. at 76-77).  Officer Davis testified that the drawers, cabinet and file folders that she examined could have held drugs, drug ledgers and logs and that the file cabinet did hold the card making machine, an item that the warrant specifically identified for seizure.[13]  (Tr. at 26-27, 31).  Also, although not

---

[13]The Government also argues that a number of other items, besides the credit card making machine, fell within the scope of the warrant's language authorizing the officers to seize "stolen items which belong to the victim . . . and others not on the scene. . . ."  [Doc. 188 at 23].   Those items include other victims' personal identification documents and credit card information.  [Id.].  While the court need not resolve this issue having found that all of the items seized fell within the plain view doctrine, the Government is correct that "[i]n identifying the property to be seized, the agents are 'required to interpret the warrant,' but are 'not obliged to interpret it narrowly.'"  Hill, 19 F.3d at 987 (citation omitted).  The fraudulently obtained information belonging to third parties - or victims - could reasonably be interpreted to fall within the scope of the warrant.

specifically trained in fraud cases, she stated that based on the information provided by Pulliam about the copying of identifications and the credit card making machine and her observations of all of the items found in the back office, she believed that the items constituted evidence of fraudulent criminal conduct.  (Tr. at 28, 30, 42-43).  The officers did not search in any location outside the scope of the warrant and properly seized items evidencing criminal conduct found in plain view.  The same is true with respect to execution of the second search warrant.

That warrant was based on the same affidavit, authorized a search for the same list of items and occurred after the officers executing the first warrant contacted Secret Service Agent Scott.[14]  (Tr. at 78, 86; Gov't Exhs. 4, 5).  Agent Scott examined the seized items and, when he learned that a computer and a shredder - which could hold evidence of criminal activity - had been left in the office, asked that a second warrant be obtained.  (Tr. at 87-89).  Detective Washington returned to the unit with Agent Scott.  (Tr. at 79).

---

[14]The parties stipulated that he is trained in and experienced in areas pertinent to and evidence related to identity theft and credit card fraud.  (Tr. at 85-86).

AO 72A
(Rev.8/82)

In the back room of the unit, Agent Scott observed an Epson printer with a counterfeit American Express card template in plain view and a shredder in which strips of American Express cards could be observed.  He also observed dates of birth and Social Security numbers on papers.  (Tr. at 91-92; Gov't Exh. 7).  When he looked at the monitor for the desktop computer, the screen was displaying a Russian website store that, based on his experience, the agent knew sold information in bulk for use in fraudulent activity.[15]  (Tr. at 92, Gov't Exh. 7).  The agent also located a Glock firearm underneath the desk, hot tin foil used to make credit cards and a garbage bag full of Green Dot loadable cards which are used to download information from skimmed credit cards.  (Tr. at 93, 103-04, Gov't Exh. 7).  The agent and detective were authorized to be in the office; there is no indication that the areas searched exceeded locations in which items listed in the warrant could be secreted; and the items seized were obviously evidence of criminal activity.  The seizures therefore fell within the plain view doctrine.

## III.   Conclusion

For the foregoing reasons and stated authority, the court **RECOMMENDS** that Defendant's motions [Docs. 53, 88, 89 and 91] to suppress be **DENIED**.

---

[15]And the computer was searched based on a consent to search given by Defendant Rives.  (Tr. at 97-100; Gov't Exh. 11).  He does not attack that consent.

**<u>Severance Motions</u>**

Pending before the court is Defendant's motion [Doc. 87] for severance of Defendants which, as discussed, is moot, and motion [Doc. 179] for severance of counts.  Defendant apparently seeks a severance based on both Rule 8(a) and Rule 14 of the Federal Rules of Criminal Procedure.  Defendant contends that, because Counts One through Eleven charge all four Defendants with fraudulent activity occurring from August 2010 through April 2012 and that Counts Twelve through Twenty-Three only charge Defendant Rives with fraudulent activity from December 2012 through November 2013, the two sets of counts should be severed.  [Doc. 179].  The Government opposes the motion to sever arguing that the evidence will establish that the fraudulent criminal activity was similar for all of the charges and occurred over the entire period of time and involved the same participants and that Defendant cannot show any compelling prejudice requiring severance.  [Doc. 189].

## I.   The Indictment

Count One of the indictment charges Defendant Rives and his co-Defendants, Rashon Bohannon, Jimia Fannin and Ashley Posey with a conspiracy, in violation of 18 U.S.C. § 1349, beginning at least in August 2010 and continuing at least to April 2012, to violate 18 U.S.C. § 1344, by executing a scheme to defraud various banking

42

entities. [Doc. 1, Count One]. The allegations in the manner and means section of Count One relate that Defendant Fannin worked for Bank of America ("BOA") from which she stole checks mailed to BOA and provided those checks to Defendants Rives and Bohannon who then recruited individuals, including Defendant Posey, to open accounts and deposit the checks. Also, using information on the stolen checks, the indictment alleges that Defendants Rives and Bohannon altered account information for the individuals issuing the checks. [Id.]. Counts Two through Eleven charge all Defendants with a scheme to defraud various banking entities, from at least August 2010, through at least April 2012, by obtaining monies from the banks and causing funds fraudulently obtained to be deposited into identified fraudulently created accounts on specific dates, between February 6, 2012, and March 12, 2012, as set forth in the indictment, in violation of 18 U.S.C. § 1344. [Id., Counts Two - Eleven].

Count Twelve charges that on or about November 7, 2013, Defendant Rives, aided and abetted by others known and unknown, possessed with the intent to defraud at least fifteen counterfeit and unauthorized access devices (credit cards) which could be used to obtain items of value, in violation of 18 U.S.C. § 1029(a)(3). [Id., Count Twelve]. Counts Thirteen through Seventeen, from December 2012 through November 2013, charges Defendant Rives, aided and abetted by others known and

43

unknown, with the intent to defraud, by trafficking in and using unauthorized access devices (various American Express credit cards as identified) to obtain items of value in excess of $1,000 during a one-year period, in violation of 18 U.S.C. § 1029(a)(2). [Id., Counts Thirteen-Seventeen].  Counts Eighteen through Twenty-Two, from December 2012 through November 2013, charges Defendant Rives, aided and abetted by others known and unknown, with possessing and using, without lawful authority, identifications of other persons, in relation to the commission of a felony, as specified in the indictment, in violation of 18 U.S.C. § 1028A(a)(1).  [Id., Counts Eighteen-Twenty-Two].  And Count Twenty-Three charges that on November 7, 2013, Defendant Rives, aided and abetted by others known and unknown, possessed equipment for making access devices (credit cards), in violation of 18 U.S.C. § 1029(a)(4).  [Id., Count Twenty-Three].

The docket reflects that Defendants Bohannon and Fannin have entered pleas of guilty.  [Docs. 111, 166].  And the Government states that Defendant Posey will be pleading guilty.  [Doc. 189 at 10; and see Docket Entry dated September 8, 2015]. Accordingly, only Defendant Rives will be tried on the counts in the indictment.

44

## II.    Discussion

Defendant seeks a severance of counts pursuant to Rule 8(a) for misjoinder of counts. [Doc. 179].  Although Rule 8(b) normally governs when multiple defendants are joined in one indictment, see United States v. Kopituk, 690 F.2d 1289, 1312 (11th Cir. 1982) ("It is well established that Rule 8(a) applies only in cases involving a single defendant charged with multiple offenses, whereas Rule 8(b) governs in cases involving multiple defendants."); United States v. Damiani, 2011 WL 7574628, at *17 (N.D. Ga. September 23, 2011), adopted at 2012 WL 983726 (N.D. Ga. March 20, 2012) ("Rule 8(b), as opposed to Rule 8(a), governs the joinder of multiple defendants in a single indictment."), under the circumstances of this case, the court will analyze the issue of joinder under Rule 8(a).  As the Government points out, Defendant will be tried alone because his co-Defendants have pleaded or will be pleading guilty making this case *de facto* an indictment involving multiple charges against a single defendant. [Doc. 189 at 9-10, citing, *inter alia*, United States v. Gooch, 665 F.3d 1318, 1325-26 (D.C. Cir. 2012) (finding that cases involving the misjoinder of multiple defendants inapposite and that a Rule 8(b) claim for severance of defendants is mooted when co-

45

defendants are not tried together; Rule 8(a) severance of counts properly governs in such a situation)].[16]

Federal Rule of Criminal Procedure 8(a) provides that:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged-whether felonies or misdemeanors or both-are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts or a common scheme or plan.

"Rule 8(a) . . . is construed broadly in favor of initial joinder." United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993). The decision whether joinder is proper is made before trial by looking to the allegations stated on the face of the indictment, see

---

[16]In any event, the test for evaluating the appropriateness of joinder of counts and of defendants is "with one exception, more or less the same. The critical difference between the two subsections is that Rule 8(a) allows joinder of offenses against a single defendant that 'are of the same or similar character,' even if such offenses do not arise out of the same series of acts or transactions. Under Rule 8(b), offenses may not be joined unless they arise out of a series of acts or transactions, regardless of how similar they may be in character." Kopituk, 690 F.2d at 1312 (citation omitted); see also United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002) (Rule 8(a) allows "joinder of offenses that 'are of the same or similar character,' even if such offenses do not arise at the same time or out of the same series of acts or transactions") (citation omitted). Accordingly, joinder under Rule 8(a) is broader than that under Rule 8(b). And see United States v. Adigun, 2011 WL 2194253, at *10 n.42 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2198308 (N.D. Ga. June 3, 2011). As the Government persuasively argues, even if Rule 8(b) were applied to the question of joinder in this case, all of the offenses charged in the indictment are properly joined. [Doc. 189 at 3-9].

United States v. Dominguez, 226 F.3d 1235, 1238 (11th Cir. 2000) (citing United States v. Weaver, 905 F.2d 1466, 1476-77 (11th Cir. 1990)), and/or to the proffer of evidence by the prosecutor "which will show the connection between the charges[,]" Id. at 1241 (citation omitted).  Therefore, "[i]f the indictment fails to show and the prosecutor fails to proffer a sufficient basis in the expected evidence to justify joinder, then a severance should be ordered."  Id.

Joinder of counts is permissible under either of two circumstances.  First, "Rule 8(a) allows joinder of offenses against a single defendant that 'are of the same or similar character,' even if such offenses do not arise out of the same series of acts or transactions."  Walser, 3 F.3d at 385 (quoting Kopituk, 690 F.2d at 1312).  "Rule 8(a) is not limited to crimes of the 'same' character but also covers those of 'similar' character, which means '[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness.'"  Id. (quoting United States v. Werner, 620 F.2d 922, 926 (2nd Cir. 1980)).  "Moreover, when offenses are joined under Rule 8(a) by virtue of their 'same or similar character,' the offenses need only be similar in category, *not* in evidence."  Hersh, 297 F.3d at 1241 (emphasis in original).  Under Rule 8(a), "[o]ffenses may [also] be joined if they are based on 'two or more acts or transactions connected together or constituting part of a common scheme or plan.' . .

47

.  Two crimes are 'connected' together if the proof of one crime constitutes a substantial portion of the proof of the other." United States v. Montes-Cardenas, 746 F.2d 771, 776 (11th Cir. 1984) (citation omitted).

All of the counts charged in the indictment are of the same or similar character. Counts One through Eleven of the indictment charge Defendant with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and with various counts of bank fraud, in violation of 18 U.S.C. § 1344, arising out his and the named co-Defendants' theft of checks from BOA and, subsequently, alteration of banking account information and theft of identities of the individuals issuing the checks, in order to obtain goods and items of value.  [Doc. 1, Counts One-Eleven].  Counts Twelve through Twenty-Three, charging access device (credit card) fraud and aggravated identity fraud, in violation of 18 U.S.C. §§ 1028A and 1029, likewise involve the theft of identities of individuals, primarily through theft of credit card information, in order to obtain goods and items of value.  [Id., Counts Twelve-Twenty-Three].  Underlying the schemes is fraudulent criminal activity for the purpose of obtaining goods and items of value belonging to third parties, whether banking institutions or individuals.

48

The Government also proffers evidence to be presented at trial establishing that, although not charged, at least Defendant Bohannon participated with Defendant Rives during the entire time span alleged in the indictment, August 2010 through November 2013, to obtain funds, goods and other items of value unlawfully through fraudulent activities.  This fraudulent conduct involved the theft of identities of third parties. [Doc. 189 at 5].  And, as the Government points out, the evidence obtained from execution of the search warrants in September 2010 at the Inn City Suites and then in November 2013 at Unit 103-A, in College Park, which included at both locations, false identification documents, fraudulent credit cards, banking statements and other indicia of both identity theft and credit card fraud, demonstrates that Defendant Rives' was engaged in similar, if not the same, types of fraudulent criminal conduct throughout the time period alleged in the indictment.  [Id. at 6-7].  While the Government has demonstrated that there is temporal overlap in the charged conduct, Rule 8(a) does not require proof that the charges are connected in time or that the same evidence would be offered at a separate trial of the charges in the indictment.  See Hersh, 297 F.3d at 1242 (citing, *inter alia*, Walser, 3 F.3d at 385-86 (the court upheld joinder of a perjury count and counts alleging false and fraudulent statements to a government agency because "even though the offenses charged were 'distinct in time,' the counts were

49

'nonetheless similar' . . .")); <u>and see</u> <u>United States v. Zitron</u>, 2013 WL 3307411, at *2 (S.D. Fla. July 1, 2013) (finding that joinder was proper because all of the counts, charging tax fraud, access device fraud and aggravated identity theft, "involve allegations that Zitron used the names of others to facilitate his acts of fraud" and that, contrary to the defendant's arguments, "the 'similarity of character of two offenses does not depend significantly upon their separation in time' or upon whether the evidence required to prove one offense overlaps with the evidence required to prove the other") (citation omitted).

Accordingly, all of the counts in the indictment are properly joined pursuant to Rule 8(a). Although Defendant also argues that Rule 14 may offer relief when counts are improperly joined for trial, which is not the case herein, he offers no basis for granting a severance based on Rule 14 prejudicial joinder. [Doc. 179, ¶ 2]. Rule 14 states in pertinent part: "If it appears that a defendant or the government is prejudiced by a joinder of offenses . . . the court may order . . . separate trial of counts. . . ." The Eleventh Circuit Court of Appeals stated, "We have long recognized that 'a District Court confronted with a Rule 14 Motion for Severance is required to balance any . . . prejudice [to the defendants] against the interests of judicial economy, a consideration involving substantial discretion.'" <u>United States v. Blankenship</u>, 382 F.3d 1110, 1120

50

(11th Cir. 2004) (citation omitted).  To justify severance, a defendant must show compelling prejudice to the conduct of his defense resulting in fundamental unfairness. See United States v. Preyear, 257 Fed. Appx. 214, 217-18 (11th Cir. 2007); United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997).  "'This is a heavy burden, and one which mere conclusory allegations cannot carry.'"  Walser, 3 F.3d at 386 (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)); see also United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007).  Defendant has not made any showing of compelling prejudice to support a Rule 14 severance or "that a severance is the only proper remedy for that prejudice[, if compelling prejudice had been shown] - jury instructions or some other remedy short of severance will not work."  United States v. Lopez, 649 F.3d 1222, 1234-35 (11th Cir. 2011) ("Because limiting instructions usually will cure any prejudice resulting from a joint trial, . . . the Supreme Court has indicated that severances need be granted only if there is a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given.") (citation omitted).[17]  Defendant offers no grounds

---

[17]And the Government persuasively argues in detail why a Rule 14 severance should not be granted.  [Doc. 189 at 12-18].

for a Rule 14 severance.  For these reasons, the court finds that Rule 14 does not require a severance of counts.

## III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 87 and 179] for severance be **DENIED**.

## Motion to Dismiss or for an Election as to Count One

Defendant alleges that Count One of the indictment, which alleges a conspiracy to commit bank fraud, is duplicitious because five different financial institutions are alleged as victims of the fraudulent scheme. [Doc. 172].  Accordingly, citing to United States v. Hinton, 127 F. Supp. 2d 548 (D. N.J. 2000), Defendant contends that Count One must be dismissed or that the Government be required to select one of the financial institution as the victim of the charged conspiracy for submission to the jury. [Id.].  The Government opposes the motion arguing that the conspiracy count is not duplicitious simply because there are multiple victims of the charged conspiracy. [Doc. 190].  The Government is correct.

"The error of duplicity is present where more than a single crime is charged in one count of an indictment."  United States v. Ramos, 666 F.2d 469, 473 (11th Cir. 1982); see also United States v. Seher, 562 F.3d 1344, 1360 (11th Cir. 2009) ("'A count

52

in an indictment is duplicitous if it charges two or more separate and distinct offenses.'") (quoting <u>Schlei</u>, 122 F.3d at 977).  "The policy reasons against duplicitous indictments 'include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.'"  <u>United States v. Miller</u>, 26 F. Supp. 2d 415, 423 (N.D. N.Y. 1998) (quoting <u>United States v. Aracri</u>, 968 F.2d 1512, 1518 (2nd Cir. 1992)); <u>see also</u> <u>United States v. Hardy</u>, 762 F. Supp. 1403, 1408 (D. Hi. 1991) (vices of duplicity include violation of defendant's Sixth Amendment rights to notice of charges brought against him and to unanimous jury verdict and of his Fifth Amendment protection against double jeopardy).

Although an indictment "may not charge multiple conspiracies in a single count[,] . . . [a] single conspiracy [ ] may have multiple objects because the single conspiracy is the crime, not its diverse objects."  <u>Miller</u>, 26 F. Supp. 2d at 423 (citation omitted).  As stated by the Supreme Court in <u>Braverman v. United States</u>, 63 S. Ct. 99 (1942), "[t]he allegation in a single count of a conspiracy to commit several crimes is

not duplicitous, for '[t]he conspiracy is the crime, and that is one, however diverse its objects.'" Id. at 102 (citation omitted); see also United States v. Diaz, 690 F.2d 1352, 1356 (11th Cir. 1982) ("An indictment may charge a conspiracy with more than one distinct substantive offense . . . ."). Likewise, there is no reason why a conspiracy charge alleging a bank fraud scheme may not have multiple victims as the targets of the conspiratorial scheme. Defendant misconstrues the conspiracy count which he attempts to treat the same as the underlying scheme to commit bank fraud, such as charged in Counts Two through Eleven of the indictment. The indictment charges a conspiracy pursuant to § 1349 with the single object of the conspiracy, that is, of the agreement, being a bank fraud scheme, in violation of 18 U.S.C. § 1344. Such a conspiracy charge is not duplicitous, even if more than one bank is alleged to be a victim of the fraud. See United States v. Smith, 891 F.2d 703, 713 (9th Cir. 1989) ("[W]here conspiracy is the charge, the established rule is that a charge of conspiracy to commit more than one offense may be included in a single count without violating the general rule against duplicity."); Ramos, 666 F.2d at 473 (the court found totally without merit defendant's claim that dual object drug conspiracy charging a 21 U.S.C. § 846 conspiracy to possess and to distribute a controlled substance was duplicitous).

54

Defendant's reliance on the decision in Hinton is misplaced.  The indictment in that case did not charge a *conspiracy* to commit bank fraud in violation of § 1349 but, instead, one count of bank fraud in violation of § 1344.  The essence of that indictment was not the agreement but the underlying bank fraud scheme.  127 F. Supp. 2d at 550. The bank fraud charge identified six financial institutions that were allegedly defrauded as a result of 128 transactions.  As the court stated, "The dates and alleged perpetrator(s) for a particular institution's transactions do not generally overlap, no transaction was directed at more than a single institution, and none of the accounts used exists in more than one bank."  Id. at 556.  For that reason, the court held, "In the event of a conviction, it would not be possible to determine which aspects of this so called unified scheme had been proved as to which financial institutions.  The indictment, therefore, is duplicitous."  Id.  In this case, as pointed out by the Government, the crime is the alleged agreement.  That single underlying conspiratorial agreement involved Defendant Fannin stealing checks from her employer, BOA, which were then provided to Defendants Rives and Bohannon.  These Defendants thereafter recruited runners, including Defendant Posey, to open checking accounts at various banks (apparently the other victim banking institutions) to deposit the checks and then have the funds withdrawn.  [Doc. 1, Count One; Doc. 190 at 2].  Also, Defendants

obtained the personal identification for senders of the checks and compromised those individuals' bank accounts.  [Id.].  The indictment charges a single conspiracy; it is not duplicitious.

And, even if Count One was determined to be duplicitous, the remedy is not dismissal of that count of the indictment or for the Government to elect a financial institution as the single victim, which, given the manner and means by which the conspiracy was carried out, does not even make sense.  Any danger flowing from the duplicity of charging more than one crime in a single count "may be cured by a jury instruction explaining unanimous agreement must be reached that the government proved, beyond a reasonable doubt," a single conspiracy to commit bank fraud.  United States v. Lefebvre, 189 Fed. Appx. 767, 772-73 (10th Cir. 2006); see also United States v. Hatfield, 2009 WL 2182593, at *2 (E.D. N.Y. July 22, 2009) (to address a duplicity issue, "'a jury instruction that ensures that the jury is unanimous as to the conduct underlying the conviction'" is an appropriate safeguard) (citation omitted); United States v. Carter, 2007 WL 230451, at *4 (S.D. Ga. January 24, 2007) (dismissal of duplicitous count is not appropriate remedy because "any concern regarding jury unanimity may be addressed by curative instructions to the jury that its verdict must be unanimous on whatever specification the jurors find to be the predicate of a guilty

AO 72A
(Rev.8/82)

verdict"); <u>United States v. Campbell</u>, 2005 WL 6436621, at *7 (N.D. Ga. October 24, 2005) ("to the extent the indictment presented any duplicity, the ambiguity could be cured through jury instructions and/or special interrogatories").

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 172] to dismiss Count One or require an election be **DENIED**.

### Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 53, 88, 89 and 91] to suppress, motions [Docs. 87 and 179] for severance and motion [Doc. 172] to dismiss be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 15th day of September, 2015.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

57